Colonial Amusement Corporation v. Commissioner.
Colonial Amusement Corp. v. Commissioner
Docket No. 13257.
United States Tax Court
1948 Tax Ct. Memo LEXIS 133; 7 T.C.M. (CCH) 546; T.C.M. (RIA) 48149; July 27, 1948
E. C. Filer, Esq., Ariel Bldg., Erie, Pa., for the petitioner. S. L. Drexler, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding involves the following deficiencies: 1942
1943
Declared value excess profits
tax
$ 330.00
Surtax
6,156.09
$5,600.56
Excess profits tax
476.80
The issue is whether petitioner is liable for surtax imposed by section 102 of the Internal Revenue Code. Findings of Fact The petitioner was organized in 1928 *134 under the laws of Pennsylvania with a capital stock of $5,000, consisting of 50 shares of common stock of a par value of $100 each. At all times since its organization, the petitioner has operated the Colonial Theater, a motion picture theater, in Erie, Pennsylvania. Victor C. Weschler, hereinafter sometimes referred to as Weschler, became associated with the Colonial Theater in 1927, when it was being operated by his father, Andrew Weschler. Weschler owned 19 shares of petitioner's stock from 1928 until about 1932, when he acquired 29 additional shares from his father. At all times thereafter Weschler has owned 48 shares of the corporation's stock. The remaining shares were held by Weschler's wife, B. H. Weschler, and J. C. Hammond, one share each. Weschler was president of petitioner and manager of its theater. His wife was secretary of the corporation and, with Weschler, constituted its board of directors in 1940, 1941, 1942, and 1943. Petitioner kept its books and filed its returns on the cash basis. Its returns for the taxable years were filed with the collector for the twenty-third district of Pennsylvania. The Colonial Theater was showing vaudeville acts in 1920. In that *135 year Andrew Weschler, the owner of the theater, leased from Nathan Cohen for a term of twenty years from June 1, 1920, at a monthly rental of $120, a lot abutting the rear of his premises. Thereafter the lessee used thirty feet of the land to increase the size of the stage of the theater and construct dressing rooms. The remainder of the leased lot was never improved. In 1932, Andrew Weschler organized the Weschler Realty Co. with a capital stock of $5,000, and thereafter transferred to it the Cohen lease and other property, including the Colonial Theater. The value of the property transferred was in excess of $5,000. The amount of the excess was entered on the books as an account payable to the transferor. He subsequently transferred his creditor rights in the account to Weschler and Weschler's wife. The balance in the accounts at the close of 1942, 1943 and 1944 was $176,306.97, $168,806.97 and $160,306.97, respectively. Weschler was president and treasurer and in active charge of the operations of the Realty Company. During the taxable years he owned 33 shares of the corporation's 100 shares of stock outstanding and held, as trustee, 66 shares for the equal benefit of his two *136 brothers. The Realty Company leased the Colonial Theater to petitioner under terms which required the lessee to make all improvements and repairs to the interior and replacements of sets, carpets, mechanical and electrical equipment, "marquee" and decorations, all in the interior of the theater, and signs. The rental paid by petitioner to the Realty Company for the theater in 1928, 1942 and 1943 was $500 a week. At times when business was not good the rental was reduced to $350 a week. In 1932, the Realty Company defaulted in the payment of rent under the Cohen lease and continued such default until January 1937, when the trustees for the lessor agreed to accept a specified sum for rent in arrears and reduced the rental for the premises to $65 a month. There are six downtown moving picture theaters in Erie, Pennsylvania, consisting of the Warner, Chase, Strand, Columbia, Colonial, and State, which have seating capacities of 2,600, 1,400, 1,200, 1,000, 900, and 700, respectively. The Warner, Chase, and Columbia were the only first-run theaters in Erie. The petitioner obtained most of its film for exhibition from producers referred to in the record as Columbia and Universal. *137 In 1936, the block-booking system of contracting for moving picture film was abolished by a court decree and as a result Columbia and Universal were able to offer bigger and better pictures. Petitioner was not compelled to compete with other theaters in Erie to obtain film. In 1936 or 1937, petitioner started to show more first-run film, and by 1941 or 1942 it was showing such pictures exclusively. Representatives of major producers had informed petitioner that on account of the small seating capacity of its theater they preferred to sell their pictures to the Warner and Chase theaters. In 1940, petitioner frequently had to turn down business on account of the size of its theater and desired to increase the seating capacity of the auditorium to 1,200 or 1,400 by placing seats in the space then occupied by the stage and dressing rooms. The Realty Company, commencing in March 1940, opened negotiations by correspondence for a longterm extension of the Cohen lease or the purchase of the leased ground. Further negotiations were had by correspondence in 1943 and at other times when a representative of the lessor was in Erie. Its efforts were not successful and ended May 8, 1944, with the *138 extension of the term of the Cohen lease to May 31, 1955, at a monthly rental of $120. At the time or prior to the execution of the agreement for the extension of the terms of the lease, Weschler was of the opinion that material necessary to make the structural changes and improvements would not be obtainable for five or six years, and he concluded that it would not be profitable to carry out his plan unless the Cohen land could be purchased or leased for a term of about twenty years. The construction work under consideration by petitioner to increase the seating capacity of the theater could not have been undertaken at any time after Pearl Harbor, on account of building restrictions and priorities for material. It was not known at the time of the hearing when such restrictions would be lifted. The balance sheets of the petitioner at the close of the years 1940 to 1943, inclusive, as disclosed by its income tax returns, were as follows: ASSETS
December
December
December
December
31, 1940
31, 1941
31, 1942
31, 1943
Cash
$40,675.50
$59,277.90
$70,550.48
$ 77,701.49
Furniture and Fixtures
(net of depreciation)
7,409.70
9,167.50
7,337.24
4,675.40
Leasehold
Government Bonds
8,700.00
18,340.63
Erie Railroad Stock
5,814.94
Accounts Receivable
41.19
Total
$48,085.20
$68,445.40
$86,587.72
$106,573.65
LIABILITIES
Notes Payable
Accounts Payable
$ 4,448.25
$ 93.75
Accrued Taxes
$ 1,097.76
255.29
550.72
$ 80.32
Capital Stock
5,000.00
5,000.00
5,000.00
5,000.00
Earned Surplus
41,987.44
58,741.86
80,943.25
101,493.33
Total
$48,085.20
$68,445.40
$86,587.72
$106,573.65
*139 The net profit of petitioner each year from 1929 to 1943, inclusive, and its surplus at the close of each year, were as follows: Year
Net Profit
Surplus
1929
$ 997.30
$ 997.30
1930
8,328.10
9,326.00
1931
(695.15)
8,630.85
1932
(1,318.84)
7,312.01
1933
41.61
7,353.62
1934
(262.27)
7,091.35
1935
(128.02)
6,963.33
1936
11,726.80
13,190.13
1937
6,343.69
19,533.82
1938
8,650.69
28,184.51
1939
3,858.14
32,042.65
1940
9,944.79
41,987.44
1941
17,654.42
58,741.86
1942
22,201.39
80,943.25
1943
20,550.08
101,493.33
Petitioner paid no dividends from 1929 to 1943, inclusive, except a dividend of $5,500 in 1936. The surplus at the close of 1942 reflects Federal taxes for 1941 in the amount of $5,123.30. The surplus at the close of 1943 reflects Federal taxes of $15,674.66. In its return for 1944, petitioner reported a surplus of $91,797.67 after deducting $40,962.11 for taxes for the years 1943 and 1944. Minutes of joint meetings of the stockholders and directors of petitioner held in April of the years 1941, 1942, and 1943 contain resolutions that no dividends be declared and that the earnings be accumulated for the purpose *140 of increasing the seating capacity of the theater. Balance sheets included in income tax returns filed by the Realty Company for 1943 and 1944 disclose the following at the close of 1942, 1943, and 1944: 1942
1943
1944
Cash
$ 28,756.06
$ 34,957.71
$ 39,170.33
Government Obligations
23,238.58
23,238.58
23,188.58
Depreciable Assets [1]
61,637.74
56,699.94
52,789.91
Land
127,877.49
127,877.49
127,877.49
Bonds, notes and mortgages payable
45,000.00
45,000.00
45,000.00
Surplus
15,833.81
24,828.59
29,515.52
Its net income during the years 1943 and 1944 was $11,639.91 and $11,614.60, respectively, and during such years the corporation paid no dividends. The corporation reported rental income of $40,000 in 1943 and $40,493.72 in 1944. In its returns for 1943 and 1944, the Realty Company reported payments of the following salaries to its officers: 1943
1944
Victor C. Weschler
$4,430
$4,441
L. R. Weschler *
2,870
3,056
A. J. Weschler *
2,870
3,056
B. H. Weschler **
517
712
Weschler was the only salaried officer of *141 petitioner. In 1938, 1939, and 1940, petitioner paid him an annual salary of about $10,000, in 1941, 1942, and 1943, $12,500, and in 1944, $13,000. In his determination of the deficiencies the respondent held that petitioner was availed of for the purpose of preventing the imposition of surtax on its shareholders by accumulating, instead of distributing, its earnings and computed surtax on $22,385.78 of income in 1942 and $20,365.68 in 1943. During the taxable years petitioner was availed of for the purpose of preventing the imposition of the surtax upon its shareholders through the medium of permitting earnings or profits to accumulate instead of being divided or distributed. Opinion Whether under the provision of section 102(a) of the Internal Revenue Code a corporation "is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders * * * through the medium of permitting earnings or profits to accumulate instead of being divided or distributed * * *" is a question of fact. The Universal Steel Co., 5 T.C. 627. The respondent found that the statute applied to petitioner's earnings in the taxable *142 years. Petitioner had the burden of disproving facts relating to such findings. Where the facts show that earnings were permitted to accumulate beyond the reasonableness of the business, it is presumed that the purpose was to avoid surtax upon stock held unless the contrary is shown by a clear preponderance of the evidence. Section 102(c), Internal Revenue Code. The primary question in the issue is purpose. Cecil B. DeMille, 31 B.T.A. 1161, 1174. The argument of petitioner is to the effect that the accumulations of earnings in the taxable years were made for the purpose of providing a fund to expand and improve the theatre. No contention is made by the petitioner that the accumulations were necessary for any other purpose. Respondent's response to the contention, aside from the impracticability of making the improvements, is that any major enlargement program is the function of the Realty Company, the owner of the theater, and not petitioner, the lessee thereof. There was a close connection between the Realty Company and the petitioner. Weschler owned all of the stock of petitioner except qualifying shares, and held one-third of the stock of *143 the Realty Company in his individual capacity and the remaining shares as trustee for his two brothers. The record contains nothing to establish whether or not petitioner and the Realty Company ever entered into a written lease for the theater. Weschler testified, when asked as to the obligation to make repairs to the interior, that the lease required the petitioner to make all improvements and repairs to the inside of the theater. The work contemplated by the petitioner involved the removal of the stage and dressing rooms located in the rear of the theater, in order to increase the seating capacity of the auditorium from 900 to 1,200 or 1,400. Such construction work would constitute alternations and enlargements of a major character and it is at least doubtful, in the state of the record before us, whether it would be within the obligations incurred by the petitioner as lessee for the upkeep and improvement of the premises. Thus, there is at least doubt whether petitioner was under legal obligation to pay the cost of the construction work it considered advisable to make. Moreover, if petitioner, as lessee, was under a legal obligation to pay the cost of the desired changes to the *144 theater, distribution of its earnings to Weschler would have protected it substantially as well as an accumulation of the profits in its own treasury. Helvering v. National Grocery Co., 304 U.S. 282. In any event, petitioner did not at any time material here have a reasonable basis for concluding that the work would be undertaken at any ascertainable time in the future. Weschler testified, in effect, that extensive alterations could not be made under a ten-year lease, or under conditions existing as to material restrictions, about twenty years. In the taxable years there was no such lease, and no reasonable prospect of acquiring one. In 1940 and 1941 a lease could not be obtained, though Weschler tried through correspondence in 1940 and 1943, and every time a representative of the lessor came to Erie, to get a lease; and it was not obtained until 1944 and then for only eleven years. From this it appears that the petitioner, instead of being reasonably expectant of making the repairs, had strong reasons to believe, in the taxable years, that it could not make the improvements desired. Attempts were made commencing in March 1940 to purchase all or a portion of the Cohen *145 property or obtain an extension of the term of the lease for a period of sufficient time to warrant the expenditure. The negotiations resulted in an extension in 1944 of the term of the lease for a period of ten years, or to 1955, which term petitioner had concluded was not long enough within which to recover the cost of the work. In the meantime building restrictions and priorities, established for obtaining building material, prevented petitioner from carrying out the project and such obstacles have not been removed. Thus, at no time during the taxable years, or thereafter to the date of the hearing, was petitioner justified in reasonably concluding that its plans could be carried out. Neither is there evidence in the proceeding in any way indicating that all of the barriers will be cleared at any time in the future. In at least that respect, the situation here differs from that prevailing in Universal Steel Co., supra, where there was reason to hope, if not to expect, that the restrictions on priorities would be lifted. Here it does not appear that petitioner ever had good reason to hope that arrangements satisfactory to it could be made to carry out its plan. It *146 does not appear that architectural plans were ever drawn for the enlargement of the seating capacity of the theater or that an estimate of the cost was ever obtained from competent authority. Weschler, using as a basis alteration costs of a theater in "Meadville" testified that he estimated that the cost, including the land, would be $175,000 or $180,000. Such testimony, without more, is not enough to support a finding on any amounts as the probable cost of the construction work. The failure of petitioner to sustain its burden of proving that the accumulations were beyond the reasonable needs of its business requires proof on its part by a clear preponderance of the evidence that the purpose was not to prevent the imposition of surtax on its shareholders. The evidence, instead of overcoming the statutory presumption, supports it. The petitioner had a net profit each year from 1929 to 1939, inclusive, except for small operating losses in 1931, 1934, and 1935. During that period its surplus increased from $997.30 to $32,042.65, and no dividends were paid other than $5,500 in 1936. Petitioner had net profits each year after 1939 through 1943 and a book surplus of $101,493.33 at the *147 close of 1943. No dividends were paid during such period and it does not appear that any of it was distributed after 1943. Such a history of earnings and dividend payments, under the circumstances prevailing here, discloses a policy to accumulate earnings instead of distributing them to stockholders. See Trico Products Corporation, 46 B.T.A. 346. The creditor position of Weschler in the Realty Company and the substantial salaries he was receiving from it and petitioner offer some reasons for the failure of petitioner to distribute more of its earnings. Considering the entire record, we find no reason to disturb the determination of the respondent. At the hearing respondent announced that due to an error in computation the deficiencies in surtax were overstated and that the correct deficiency in surtax in 1942 is $2,777.93 and in 1943, $3,075.55. With those adjustments. Decision will be entered for the respondent. Footnotes
1. Less reserve for depreciation.↩
*. Brother of Victor. ↩
**. Wife of Victor.↩